IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

DANIEL ALVARADO MARTINEZ, et al.,    )
    )
    Plaintiffs,    )
    )    NO. 3:18-cv-00583
v.    )    JUDGE RICHARDSON
    )
FIRST CLASS INTERIORS OF NAPLES,    )
LLC, et al,    )
    )
    Defendants.    )

## **MEMORANDUM OPINION**

Plaintiffs in this action under the Fair Labor Standards Act ("FLSA") are individuals who performed drywall installation, framing, and finishing on the JW Marriott Hotel recently constructed in downtown Nashville, Tennessee. Defendant Mr. Drywall Services, LLC ("MRD") contracted to complete the drywall portion of the Marriott project.

Pending before the Court are three motions: MRD's Motion to Decertify Case as a Collective Action (Doc. No. 274), MRD's Motion for Summary Judgment (Doc. No. 271), and Plaintiffs' Motion for Summary Judgment (Doc. No. 210). The relevant briefing filed in connection with each motion is detailed in the procedural background section, below. All three motions are ripe for review.

For the reasons that follow, the Court concludes: (1) the Named Plaintiffs are "similarly situated" to other employees such that collective action treatment is appropriate under the FLSA, *see* 29 U.S.C. § 216(b); (2) genuine issues of material fact exist as to whether MRD was Plaintiffs' employer for purposes of the FLSA; (3) no genuine issue of material of fact exists with respect to Plaintiffs' FLSA class claims (Count I) against defendant First Class Interior of Naples, LLC

("FCI"), and Plaintiffs are entitled to judgment on those claims as a matter of law; (4) a genuine dispute of material fact exists as to Individual Plaintiff Carlos Castro's FLSA retaliation claim (Count II) against FCI; and (5) given that Defendants' liability remains unresolved (except for FCI's liability on Count I), it would be premature at this juncture to determine whether there is a genuine issue of material fact on the issue of damages. Accordingly, MRD's Motion to Decertify Case as a Collective Action will be **DENIED**; MRD's Motion for Summary Judgment will be **DENIED**; and Plaintiffs' Motion for Summary Judgment will be **GRANTED** on Count I as to FCI, **DENIED** on Count I as to MRD, **DENIED** on Count II as to FCI,[1] and **DENIED** as to all Defendants on the issue of damages.

## BACKGROUND

A. <u>Procedural background</u>

In this conditionally certified collective action with two opt-in classes, Plaintiffs allege that Defendants' policies and practices violated the minimum wage and overtime provisions of the FLSA. (Doc. No. 1 at ¶¶ 1–2). Specifically, Plaintiffs allege that Defendants failed to pay Plaintiffs and members of the Overtime Class one and one-half times their regular hourly rate for all hours worked in excess of forty hours per week during the relevant period. (*Id*. at ¶ 50). Plaintiffs also allege that Defendants failed to pay Plaintiffs and members of the Overtime Class the federal minimum wage for all hours worked after clocking in, including hours spent attending safety meetings and performing other such work. (*Id*.). Plaintiffs allege that Defendants failed to pay Plaintiffs Castro and Martinez, and members of the Last Paycheck Class, for what turned out to be Plaintiffs' final two weeks of employment. (*Id*. at ¶ 49). Plaintiffs further claim that after members

---

[1]Plaintiffs' Motion for Summary Judgment with respect to Count II is inapplicable as to MRD because Plaintiffs do not assert Count II against MRD. (Doc. No. 1 at ¶ 86).

of the Last Paycheck Class requested their wages, Defendants FCI and Jose Roberto Reyes ("Reyes") terminated those drywall workers in violation of the FLSA's antiretaliation provision. (*Id*. at ¶¶ 86–92).

On September 6, 2019, the Court conditionally certified this matter as a collective action consisting of the following classes:

> The "Overtime Class" will consist of all workers who were employed by Defendants performing drywall installation, framing, and/or finishing work on the Marriott Project at any time between July 2017 and May 2018.

> The "Last Paycheck Class" will consist of all workers who were employed by Defendants performing drywall installation, framing, and/or finishing work on the Marriott Project whose employment was terminated at any time between May 21 and May 29, 2018.

(Doc. No. 97 at 21).

The Court granted a Joint Motion to Dismiss Counts III and IV of the Complaint (Doc. No. 216) on May 4, 2021, leaving Plaintiffs' claims for violations of the FLSA (Count I) and FLSA retaliation (Count II) as the only remaining claims. (Doc. No. 218). MRD then filed unopposed motions to dismiss Opt-In Plaintiff Karen Flores and Plaintiff Daniel Alvarado Martinez, respectively. (Doc. Nos. 263 and 265). The Court granted the motions to dismiss Plaintiff Flores and Plaintiff Martinez, respectively, on March 25, 2021 (Doc. Nos. 268 and 270), leaving four remaining Named Plaintiffs and 110 remaining Opt-In Plaintiffs. (Doc. No. 285 at 3, citing Doc. Nos. 246, 268, and 270).

The following motions remain pending before the Court:

On April 27, 2020, Plaintiffs filed a Motion for Summary Judgment (Doc. No. 210) along with a Memorandum in Support (Doc. No. 212) and a Statement of Undisputed Facts (Doc. No. 213). MRD filed a Response to the Motion for Summary Judgment (Doc. No. 276) and a Response

to the Statement of Undisputed Facts (Doc. No. 277). Plaintiffs replied to both Responses. (Doc. Nos. 280 and 281).

On May 21, 2021, MRD filed a Motion for Summary Judgment (Doc. No. 271) along with a Memorandum in Support (Doc. No. 272) and a Statement of Undisputed Facts (Doc. No. 273). Plaintiffs filed a Response to the Motion for Summary Judgment (Doc. No. 286) and a Response to the Statement of Undisputed Facts (Doc. No. 287). MRD filed a Reply to the Response to the Motion for Summary Judgment (Doc. No. 292).

Also on May 21, 2021, MRD filed a Motion to Decertify Case as a Collective Action (Doc. No. 274, "Motion to Decertify") along with a Memorandum in Support (Doc. No. 275). Plaintiffs responded. (Doc. No. 285). MRD thereafter replied. (Doc. No. 288, corrected at Doc. No. 291).

FCI made no filings in response or in relation to any of the foregoing motions.[2]

B. Factual background[3]

MRD provides drywall hanging and interior finishing services to other construction contractors for commercial and residential projects. (Doc. No. 287 at ¶ 5). Raymond Philibert, and AC Florida Inc., are the owners of MRD. (*Id.*). FCI is a Florida limited liability company that provides labor to subcontracting companies. (*Id.* at ¶ 6). MRD and FCI are separate entities and have never had common ownership or management. (*Id.* at ¶¶ 10–11). Additionally, MRD does not share any workers, bank accounts, or addresses with FCI, and vice versa. (*Id.* at ¶¶ 12, 14–15).

---

[2] On May 3, 2020, the Court issued a stay of all proceedings in this case regarding and relating to Reyes due to his filing of bankruptcy in the Southern District of Florida. (Doc. No. 186). Accordingly, nothing herein addresses any claims against Reyes.

[3] Unless otherwise noted, the facts set forth in this section are undisputed, and are taken from Plaintiffs' Response to MRD's Statement of Undisputed Facts (Doc. No. 287) and/or MRD's Response to Plaintiffs' Statement of Undisputed Facts (Doc. No. 277).

Skanska USA Building, Inc. ("Skanska"), the general contractor for the construction of the Nashville JW Marriot Hotel (the "Project"), contracted with MRD—along with other drywall contractors—to complete the drywall portion of the Project. (*Id.* at ¶¶ 2–4). In February 2017, MRD entered into a subcontract with FCI ("FCI Subcontract") under which FCI would provide the labor necessary to perform and complete the scope of the work set forth in the FCI Subcontract, including drywall framing, installation, and finishing. (*Id.* at ¶ 18). Additionally, MRD subcontracted with three other companies to provide labor, services, and materials for the Project. (*Id.* at ¶ 19). MRD and Plaintiffs disagree about whether FCI provided tools to workers on the Project. (*Id.* at ¶ 18). It is undisputed that MRD charged FCI for equipment and water that MRD provided to FCI and the workers. (*Id.* at ¶ 78).

Plaintiffs all worked on the Project. (*Id.* at ¶ 1; Doc. No. 212 at 1). It is disputed, however, (i) whether Plaintiffs are properly classified as former employees (or, instead, independent contractors, or neither employees nor independent contractors) of MRD; and similarly, (ii) whether Plaintiffs are properly classified as former employees (or, instead, independent contractors, or neither employees nor independent contractors) of FCI.[4]

---

[4] MRD contends that Plaintiffs were solely hired by, and worked solely for, FCI and that therefore Plaintiffs were not employees of MRD and were at most only independent contractors of MRD. (Doc. No. 272 at 2; Doc. No. 287 at ¶ 45). Plaintiffs dispute this contention and instead claim that they were under the direct supervision of both MRD and FCI. (Doc. No. 212 at 4). To support this claim, Plaintiffs state that they were expected to obey instructions from both FCI and MRD supervisors, that both Defendants' supervisors had the power to discipline or fire Plaintiffs, and that MRD unilaterally made personnel decisions pertaining to Plaintiffs. (*Id.* at 4–5). Moreover, Plaintiffs assert that MRD's supervisors continuously monitored Plaintiffs to "ensure these workers did the work they were supposed to do." (*Id.* at 4). For purposes of the factual background section, the Court assumes *arguendo* (for ease of reading the factual background section only) that Plaintiffs were employees of both FCI and MRD; however, as described further below, the Court will not draw any conclusion at this time regarding whether, in fact, MRD was Plaintiffs' "employer" under the relevant standards for Plaintiffs' claims. Similarly, any references in the factual background section to certain individuals being "FCI's workers" or "MRD's workers" are not meant to indicate any position taken by the Court as to the employer-employee relationship

MRD asserts that it had no input or involvement in the hiring of any of FCI's workers, including Plaintiffs. (Doc. No. 287 at ¶ 47). Plaintiffs claim that FCI could not hire any particular worker(s) on the Project without approval from MRD. (Doc. No. 277 at ¶ 38). MRD claims that Plaintiffs were recruited by Reyes and hired by FCI. (Doc. No. 287 at ¶ 46). Plaintiffs claim that MRD would tell FCI when MRD wanted more workers on the job and where on the Project MRD wanted those workers to work. (Doc. No. 277 at ¶ 38). It is undisputed that, even if MRD requested that a worker cease being assigned to the Project, FCI could continue to employ that worker by assigning him to other projects. That is because FCI is in the business of hiring individuals to supply labor to contractors and decides where its employees go (except that FCI would not control that decision as to the Project to the extent MRD requested "firing" or sending home any particular worker(s) from the Project, in which case FCI necessarily honored MRD's request rather than making an independent decision on the matter). (Doc. No. 287 at ¶¶ 54–55; Doc. No. 277 at ¶ 36).

MRD claims that workers for the Project, including Plaintiffs, understood that MRD and FCI were separate companies and that the workers understood they worked for FCI. (Doc. No. 287 at ¶ 17). Plaintiffs claim that many of them did not know which corporation employed them or the supervisors on the Project, and instead knew only which individual supervisors were in charge of the work on the Project—which included supervisors from MRD. (*Id.*). MRD paid FCI either agreed-to sums for completed work or agreed-to hourly rates for supplemental workers pursuant to the terms of the FCI Subcontract. (*Id.* at ¶ 61). As such, workers were paid different hourly rates depending on their individual experience and job assignments. (*Id.* at ¶ 57). For example, MRD agreed to pay supplemental workers $25 per hour worked by a skilled worker and $18 per hour

---

between FCI or MRD and such individuals; instead, the Court simply uses such terminology for lack of better (or more precise) terminology when describing the (disputed) facts underlying the present case.

worked by unskilled workers (referred to as "laborers"). (*Id.* at ¶ 25). Workers (including Plaintiffs) were then paid by (and received their checks from) FCI, not MRD.[5] (*Id.* at ¶ 58). FCI paid the workers on the Project regardless of whether or how much MRD paid FCI for work performed. (*Id.* at ¶ 62).

MRD claims that FCI likewise was solely responsible for determining whether—and, if so, how much—Plaintiffs were owed for working overtime. (*Id.* at ¶ 63). Plaintiffs deny this. MRD claims that its payments to FCI were processed weekly and required both FCI's submission of a requisition form for "work completed" and MRD's approval of payment. (*Id.* at ¶ 32). Plaintiffs contend that MRD, in violation of what Plaintiffs claim was MRD's duty to pay them on a timely basis, did not pay on a weekly basis and was routinely late on payments. (Doc. No. 210-6 at 40).

Initially, FCI recorded Plaintiffs' respective entry times and exit times at the Project with a handwritten sign-in sheet. (Doc. No. 287 at ¶ 82). However, FCI later recorded Plaintiffs' entry and exit times with a fingerprint scanning machine to ensure more accurate documentation. (*Id.* at ¶ 83). In order to get paid by MRD, FCI provided the hours worked by the hourly workers, for which MRD had agreed to compensate FCI by the hour. (*Id.* at ¶ 85). FCI did not need to inform MRD how much the workers on the Project were paid; rather, FCI needed to inform MRD only of the number of hours worked and the classification—set forth in the FCI Subcontract—into which each worker fell. (*Id.* at ¶ 86). Eventually, MRD began to separately track how many workers were on the Project and what hours they worked. (*Id.* at ¶ 88).

FCI would communicate with the workers about what days and times they needed to report to work, when (and for how long) they could take breaks, and how to log their work hours. (*Id.* at

---

[5] While Plaintiffs do not dispute that FCI was in charge of distributing their pay checks, they contend that this was just a "pass-through" from MRD. (Doc. No. 287 at ¶ 58).

¶ 69). As the general contractor on the Project, Skanska controlled the schedule of work. (*Id.* at ¶ 97). After a required daily safety meeting, Skanska would meet with MRD to provide directions and information about the work to be done on the Project. (*Id.* at ¶ 98). MRD asserts that its supervisors would then relay the information to FCI's supervisors, who would direct the workers accordingly. (*Id.* at ¶ 99). Plaintiffs claim that MRD played a direct role in deciding how work would be divided and which workers were assigned to certain tasks. (Doc. No. 213 at ¶ 26–34).

Ultimately, Skanska was not happy with FCI's work and did not want to pay for work performed by FCI (including work completed by Plaintiffs but attributed by FCI to itself). (Doc. No. 287 at ¶ 115). FCI's failure to perform its obligations under the FCI Subcontract led to significant back charges against MRD from Skanska, and consequently Skanska brought in a separate company to finish the Project. (*Id.* at ¶¶ 116–17). Finally, on May 26, 2018, MRD terminated its agreement with FCI, in part because work was not being performed to Skanska's and MRD's satisfaction. (*Id.* at ¶ 118).

On May 29, 2018, after not having been paid for the prior two weeks of work, about 80 workers (including Plaintiffs), went to the Project site and demanded pay. (*Id.* at ¶ 64). An MRD employee told the group of workers to leave the worksite. (Doc. No. 277 at ¶ 36).[6] Despite making this demand on May 29, 2018, the workers never received pay for their last two weeks of work.

---

[6] In MRD's Response to the Statement of Facts, MRD asserts primarily that this fact is "disputed" but then follows this assertion with statements that do not address the particular alleged fact at issue, *i.e.*, that "on the morning of May 29, 2018, [MRD employee Richard Nadeau] told a group of drywall workers to leave the Worksite." (Doc. No. 277 at ¶ 36). Further, Plaintiffs cite MRD's "Response to RFA No. 20" where MRD admitted this fact. Thus, the Court does not find that MRD actually (or effectively) disputes this particular fact and will treat as true that an MRD employee did in fact ask the workers to leave the worksite after the workers demanded pay on the morning of May 29, 2018.

(*Id.* at ¶ 80).[7] Plaintiffs now claim that Defendants violated the FLSA by (allegedly) failing to pay Plaintiffs minimum wage for all compensable time. (Doc. No. 212 at 2). Plaintiffs additionally allege Defendants further violated the FLSA by (allegedly) failing to pay them one and one-half times their regular hourly rate for all hours worked in excess of forty hours per week during the relevant period. (*Id.*).

## LEGAL STANDARD

### A.  Motion to Decertify

The FLSA provides that a collective action to recover compensation may be maintained against any employer "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). This provision authorizes "collective actions" to enforce the FLSA "brought by an employee on his own behalf and all those who are 'similarly situated' and who 'opt-in' by giving consent in writing to become a party." *Thompson v. Bruister & Assocs., Inc.*, 967 F. Supp. 2d 1204, 1212 (M.D. Tenn. 2013).

The Sixth Circuit recognizes a two-step process to determine whether other employees are similarly situated to the plaintiff seeking to certify a collective action. *Bradford v. Logan's Roadhouse, Inc.*, 137 F. Supp. 3d 1064, 1071 (M. D. Tenn. 2015). The first phase takes place at the beginning of discovery (at the "notice stage"), where the plaintiff bears the burden of showing that employees in the putative class are similarly situated to him. *Id*. The plaintiff must show only that his position is similar, as opposed to identical, to the positions held by the putative class members. *Id*. (citing *Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 546 (6th Cir. 2006)). At this

---

[7] Though MRD primarily responds to this paragraph of Plaintiffs' Statement of Facts with the word "disputed," MRD's statements after that response focus on its belief that MRD had no obligation to pay "FCI's workers" rather than on whether the workers ever received payment (from any Defendant) for this two-week period. (Doc. No. 277 at ¶ 80). MRD does not appear to dispute that the workers never received pay for these last two weeks of work.

first stage, courts use a "fairly lenient standard" that typically results in conditional certification of a representative class. *Id*.; *see also Ott v. Publix Super Mkts., Inc.*, No. 3:12-cv-486, 2013 WL 1874258, at * 1 (M.D. Tenn. May 3, 2013). The court does not resolve factual disputes, decide substantive issues going to the merits, or make credibility determinations at this first stage. *Bradford*, 137 F. Supp. 3d at 1072; *Wlotkowski v. Mich. Bell Tel. Co.*, 267 F.R.D. 213, 217 (E.D. Mich. 2010). If the court determines that conditional certification is warranted, then it may authorize the notification of similarly situated employees to allow them to opt into the lawsuit. *Comer*, 454 F.3d at 546; *Bradford*, 137 F. Supp. 3d at 1072. The certification at this stage is conditional and by no means final. *Bradford*, 137 F. Supp. 3d at 1072.

At the second stage (the "decertification stage"), after discovery, the defendant may move to decertify the conditional class. *Id.* Compared to the first stage, at the second stage (at which the instant case now stands), the court has access to more information and employs a "stricter standard" to more closely examine whether class members are, in fact, similarly situated. *Comer*, 454 F.3d at 547. The standard at the second stage, though stricter than the standard at the first stage, is still more lenient than the one applicable to class certification under Federal Rule of Civil Procedure 23:

> Under the FLSA, opt-in plaintiffs only need to be "similarly situated." While Congress could have imported the more stringent criteria for class certification under Fed. R. Civ. P. 23, it has not done so in the FLSA. *See Grayson* [*v. K Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir. 1996)] (section 216(b)'s "similarly situated" requirement is less stringent than Rule 20(a) requirement that claims "arise out of the same action or occurrence" for joinder to be proper, or even Rule 23(b)(3)'s requirement that common questions predominate for a 23(b)(3) class to be certified). . . . [I]t is clear that plaintiffs are similarly situated when they suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs.

*O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 584–585 (6th Cir. 2009), *abrogated on other grounds by Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016).[8]

Whether to grant a motion to decertify lies within the discretion of the Court. *See Monroe v. FTS USA, LLC*, 860 F.3d 389, 401 (6th Cir. 2017) ("We review a district court's certification of a collective action under an 'abuse of discretion' standard."); *Frye v. Baptist Mem'l Hosp., Inc.*, 495 F. App'x 669, 671 (6th Cir. 2012) ("We review the district court's decertification order for abuse of discretion.").

---

[8] The *O'Brien* court also emphasized the importance of considering the possibility of "partial decertification," when appropriate:

> In general, . . . a district court should examine whether partial decertification is possible, when faced with the situation where a subset of the plaintiffs fail to allege violations of the FLSA. The option of partial certification is important to consider, because it counters the argument that a collective action must be totally decertified if some members are not similarly situated to the others. In general, plaintiffs who are not similarly situated—for instance, plaintiffs who did not allege suffering under [any alleged] unlawful practice—could be dismissed while keeping intact a partial class. Plaintiffs who do present evidence that they are similarly situated to the lead plaintiffs should not be barred from the opportunity to be part of a FLSA collective action, because the collective action serves an important remedial purpose. Through it, a plaintiff who has suffered only small monetary harm can join a larger pool of similarly situated plaintiffs. *See Hoffmann–La Roche, Inc., v. Sperling*, 493 U.S. 165, 170, 110 S. Ct. 482, 107 L.Ed.2d 480 (1989). That pool can attract effective counsel who knows that if the plaintiffs prevail, counsel is entitled to a statutorily required reasonable fee as determined by the court. . . . As some district courts have noted, "imposing any additional restrictions from Rule 23 would be contrary to the broad remedial goals" of the FLSA and its sister statutes— such as the Equal Pay Act, 29 U.S.C. § 206(d), and the ADEA, 29 U.S.C. § 626(b)—which incorporate the same statutory language concerning collective actions. *See* 7B Wright, Miller, and Kane, [*Federal Practice and Procedure*] § 1807 at 481 n. 25, at 468–69 nn. 2–3 [(3d ed. 2005)].

*O'Brien*, 575 F.3d at 586. Although decertification can occur as to some *plaintiffs* but not other plaintiffs, that does not mean—and, as discussed below, the Court does not find—that decertification can occur as to some *defendant(s)* but fewer than all other defendants.

In *O'Brien*, the Sixth Circuit commented on the definition of "similarly situated" for purposes of a collective-action certification decision and "tacitly approved," *Frye*, 495 F. App'x at 672, three factors that a district court may employ when using its discretion to determine whether certification is appropriate:

> The Fair Labor Standards Act does not define "similarly situated," and neither has this court. However, district courts have based their final-certification decisions on a variety of factors, including the "factual and employment settings of the individual[ ] plaintiffs, the different defenses to which the plaintiffs may be subject on an individual basis, [and] the degree of fairness and procedural impact of certifying the action as a collective action." *See* 7B Wright, Miller, & Kane, *supra*, § 1807 n. 65 at 497; *Anderson* [*v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007)]. The lead plaintiffs bear the burden of showing that the opt-in plaintiffs are similarly situated to the lead plaintiffs. *See* 7B Wright, Miller, and Kane, *supra*, § 1807 at 476 n. 21.

*O'Brien*, 575 F.3d at 584.

This helpful language from *O'Brien* is not an exhaustive guide to the "similarly situated" analysis, however. As this Court has described:

> In *O'Brien*, the Sixth Circuit did "not purport to create comprehensive criteria for informing the similarly-situated analysis," [575 F.3d] at 585, but it did make several salient observations that guide this Court's consideration. "Showing a 'unified' policy is not required," and, unlike Fed. R. Civ. P. 23(b), just because individualized issues may predominate, this does not necessarily mean that a collective action is inappropriate. *Id.* at 584. On the other hand, "it is clear that plaintiffs are similarly situated when they suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all plaintiffs." *Id.* at 585. Similarly, plaintiffs can be similarly situated where "their claims [a]re unified by common theories of statutory violations, even if the proofs of these theories are inevitably individualized and distinct." *Id.*

*Thompson*, 967 F. Supp. 2d at 1213.

B. <u>Motion for Summary Judgment</u>

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms,

this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Id.* A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Harris v. Klare*, 902 F.3d 630, 634–35 (6th Cir. 2018).

The moving party has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Alternatively, the moving party may meet its initial burden by otherwise "show[ing]"— even without citing materials of record—that the nonmovant "cannot produce admissible evidence to support a material fact (for example, the existence of an element of a nonmovant plaintiff's claim)." Fed. R. Civ. P. 56(c)(1)(B).[9] If the summary judgment movant meets its initial burden,

---

[9] This alternative was implemented (or at least confirmed) via 2010 amendments to Rule 56. *Pittman* did not address this alternative, perhaps because *Pittman* was focused on what the Supreme Court had to say in 1986 in *Celotex*, and not on the provisions newly added in Rule 56(c)(1)(B) eight years before *Pittman* was decided. The Advisory Committee notes to the 2010 amendments to Rule 56 explain the nature of and reason for this alternative:

> Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials. One party, without citing any other materials, may respond or reply that materials cited to dispute or support a fact do not establish the

then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628.

Consistent with the above observations made specifically about a defendant-movant seeking summary judgment on a plaintiff's claims, any party asserting that a fact cannot be, or genuinely is, disputed—*i.e.*, any party seeking summary judgment and any party opposing summary judgment, respectively—can support the assertion either by: (a) citing to materials in the record, including, but not limited to, depositions, documents, affidavits, or declarations, Fed. R. Civ. P. 56(c)(1)(A), or (b) "showing" (i) that the adverse party cannot produce admissible evidence to raise a genuine dispute as to that fact or (ii) that contrary to the claim of the adverse party, the

_____

absence or presence of a genuine dispute. *And a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact.*

Fed. R. Civ. P. 56(c)(1)(B) advisory committee's note to 2010 amendments (emphasis added). As for what kind (and degree) of "showing" is required—including what kind of "showing" is required for a movant seeking to meet its initial burden under Rule 56(c)(1)—the case law is unclear. *Lansky v. Prot. One Alarm Monitoring, Inc.*, No. 17-2883, 2019 WL 575390, at *2 (W.D. Tenn. Feb. 12, 2019) (noting that where a defendant-movant "cites virtually no record material, it must make an adequate 'showing' of an absence of admissible evidence under Rule 56(c)(1)(B). Rule 56 and Sixth Circuit case law do not expressly define what is necessary for a proper 'showing' under Rule 56(c)(1)(B)."). A "showing" may well be adequate even if it is relatively minimal, but the undersigned declines to go nearly as far as cases, like *Lansky*, that state that it is enough for a defendant-movant merely to *assert* that the plaintiff could not adduce evidence sufficient to meet its burden of persuasion at trial, *i.e.*, that a defendant-movant meets its Rule 56 burden merely by challenging a plaintiff to "put up or shut up." *Id.* Such a statement seems inconsistent with cases like *Pittman* (although, admittedly, not *all* Sixth Circuit cases), which in no way suggest that a defendant-movant can meet its burden merely by making such a challenge; any such suggestion indeed would make a defendant's initial "burden" illusory. Such a statement is also inconsistent with any reasonable definition of a "showing," which never would include a mere assertion; one does not "show" something to any degree whatsoever merely by asserting it. Suffice it to say that, pending clarification in future precedent, the undersigned will deem a "showing" of the absence (or existence) of a genuine dispute to be sufficient under Rule 56(c)(1)(B) if the undersigned believes that there is demonstrably good reason—based on common sense, experience, and extant information not reasonably disputable though not in the record—to conclude at least preliminarily that a genuine dispute does not (or does) exist.

materials cited by the adverse party do not actually establish the absence or presence (as the case may be) of a genuine dispute as to that fact.

In reviewing a motion for summary judgment, this court must view the evidence in the light most favorable to the non-moving party. *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020) (quoting *Anderson*, 477 U.S. at 248). Likewise, the court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id*. The court determines whether a genuine dispute exists by analyzing whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id*. The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the non-moving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

## ANALYSIS

A. MRD's Motion to Decertify (Doc. No. 274)

MRD moves to decertify this matter "as to MRD" because: (1) the evidence and the record demonstrate that MRD was not the statutory or joint employer of the Plaintiffs; (2) differences in several aspects of the factual and employment settings of the Plaintiffs weigh in favor of decertification; (3) Plaintiffs are subject to various individualized defenses; (4) fairness and procedural considerations weigh in favor of decertification; and (5) there is no evidence of a single decision, policy, or plan that MRD applied to Plaintiffs in violation of the FLSA. (Doc. No. 275 at 1–2). Plaintiffs' response rests on the self-defeating nature of MRD's argument:

MRD's primary argument in support of decertification is that – across the board – "MRD is not the Plaintiffs' statutory or joint employer." However, this argument is self-defeating as to decertification as it is premised on the assumption that Plaintiffs are all similarly situated. MRD does not argue that it is the statutory employer of some Plaintiffs but not of others. Instead, MRD argues that Plaintiffs are so similar to each other in their work on the Project that the Court may make a determination as to MRD's liability on a collective basis.

(Doc. No. 285 at 3) (citation omitted).

As an initial matter, the Court must point out a significant flaw underlying MRD's entire Motion to Decertify. MRD argues throughout the Motion and accompanying Memorandum that the action should be decertified "*as to MRD.*" (Doc. No. 275 at 1, 3, 7, 9, 10, 11) (emphasis added). The Court understands the gist of this argument to be that decertification is appropriate specifically as to MRD (and not as to any other defendant) because MRD in particular should not be liable to Plaintiffs. Though MRD does not explain what it means by seeking decertification only "as to MRD," the Court interprets MRD to argue that the action should be decertified, but in such a way that the classes *could* remain certified to pursue claims against other defendants.

By framing the Motion this way, MRD demonstrates a fundamental misunderstanding of the standard for certification of a collective action. The question of collective-action certification rests on the requirement that *employees* be "similarly situated." 29 U.S.C. § 216(b).[10] This is true at both the "first" and "second" stage of the collective action certification process. *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 877 (6th Cir. 2012). The issue of a particular defendant's

---

[10] There is another way of conceiving of the flaw in MRD's argument here. In a sense, MRD's argument that decertification should occur (only) as to MRD is an argument that MRD is not similarly situated to its co-defendant (FCI). That is, MRD argues that decertification is appropriate as to MRD in particular because these two Defendants are not similarly situated with one another with respect to potential liability against Plaintiffs, and instead MRD is situated so as to have unique (or better) defenses to liability. But the actual issue on decertification is whether *class members* are similarly situated to one another, not whether *the defendants* are similarly situated to one another.

liability (and in particular, that defendant's liability by comparison to another defendant's liability) has no role in the Court's analysis of whether certification is appropriate. MRD's argument is thus irrelevant to the decertification issue; what matters is not whether a particular defendant is particularly ill-suited (especially compared to other defendants) to be held liable to the plaintiff(s),[11] but instead whether the Named and Opt-In Plaintiffs are similarly situated to one another. Thus, wherever MRD asserts in the Motion to Decertify and accompanying Memorandum that the classes should be decertified "as to MRD," the Court disregards the suggestion and instead remains focused on whether the classes should be decertified, period (meaning, as to all Defendants).

There is another problem (for MRD) with its recurring contention that the classes should be decertified "as to MRD." The basis for that contention is MRD's assertion that it is not the employer of Plaintiffs (*any* Plaintiffs). But this contention undercuts the Motion to Decertify to an extent because it suggests that all Plaintiffs are similarly situated to one another in at least one relevant respect (that they were not employed by MRD) and perhaps in an additional respect (that they all instead were either employed by, or independent contractors of, FCI).

With these principles in mind, the Court's analysis of the Motion to Decertify will be organized and guided by the three (non-comprehensive) factors set forth by the Sixth Circuit in *O'Brien*.[12]

---

[11] Of course, this issue is (to say the least) vital in other contexts, but not in the present context of a motion to decertify a collective action.

[12] As noted above, there are two classes that have been conditionally certified in this matter: the Overtime Class and the Last Paycheck Class (defined in the procedural background section above). MRD seeks decertification of both classes. The Court finds it is most efficient to discuss both classes together throughout the opinion in the same way that the parties discuss both classes together in their briefing on the motions at issue.

i. *Factual and employment settings of the individual plaintiffs*

The first factor, the factual and employment settings of the individual Plaintiffs, weighs against decertification. MRD points to only minor differences in factual and employment settings among the various Plaintiffs, the majority of which do not impact the alleged statutory violation and are not significant enough to overcome the overwhelming similarities between each Plaintiff's working conditions and the common grievance of each group of Plaintiffs (that they allegedly were all denied overtime pay, were not paid the federal minimum wage for all hours worked, and/or were denied wages for their last two weeks of work).

Even at the decertification stage, "*similarly* situated does not mean *identically* situated." *Wilks v. The Pep Boys,* No. 3:02-cv-837, 2006 WL 2821700, at *3 (M.D. Tenn. Sept. 26, 2006). *See also Noel v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.,* No. 3:11-cv-519, 2015 WL 3650376, at *4–5 (M.D. Tenn. June 11, 2015) (finding that the first factor weighed against certification even where the defendant "set[] forth in great detail differences between and among class members" and noting that "[p]arties would be hard pressed to identify an example in which employees participating in a collective action were subjected to identical circumstances"). As the undersigned noted decades ago, there is a continuum between things being "the same" (*i.e.,* "identical") and being merely "similar" or even "different." Eli J. Richardson, *Taking Issue with Issue Preclusion: Reinventing Collateral Estoppel*, 65 Miss. L.J. 41, 70 (1995). And for many comparisons between two things, the specific location on the continuum is a subjective determination that is in the eye of the beholder. *See id.*; *cf. Frank v. Gold'n Plump Poultry, Inc.*, No. 04-cv-1018 (PJS/RLE), 2007 WL 2780504, at *4 (D. Minn. Sept. 24, 2007) ("If one zooms in close enough on anything, differences will abound."). But if the beholder is a court determining whether class members are similarly situated for purposes of a decertification motion, the court

must make that subjective call, calling it like it sees it based on its perception of what does and does not qualify as "similar." In so doing the Court must recognize that there is a distinction between being similarly situated and identically situated; situations can be placed on the continuum at the "similar" point even though they cannot reasonably be placed at the "identical" point.

Additionally, the existence of commonality—meaning plaintiffs' having been impacted by a "single decision, policy, or plan"—may "assuage concerns about plaintiffs' otherwise varied circumstances." *Wilks*, 2006 WL 2821700, at *3; *see also Houston v. URS Corp.*, 591 F. Supp. 2d 827, 833–34 (E.D. Va. 2008) ("As other courts have found, plaintiffs are similarly situated to a class when they 'raise a similar legal issue as to coverage, exemption, or nonpayment of minimum wages or overtime arising from at least a manageably similar factual setting with respect to their job requirements and pay provisions.'") (brackets omitted) (quoting *De Luna-Guerrero v. N.C. Grower's Ass'n,* 338 F. Supp. 2d 649, 654 (E.D.N.C. 2004) (where the court notes that "their situations need not be identical")).

In analyzing the first factor, the Court first notes what Plaintiffs all have in common. As stated in Plaintiffs' Response, all of these workers "performed the same type of work (drywall and finishing), on the same Project site, under the same supervisory system (one MRD superintendent and one FCI supervisor per group of Plaintiffs), for approximately the same hourly pay with no overtime pay." (Doc. No. 285 at 5–6). Additionally, the fact that all Plaintiffs failed to receive one and one-half times their regular rate of pay for any hours worked over 40 hours in a week (regardless of whether MRD or FCI would have been responsible for making such payments)—a fact that is not disputed by MRD (Doc. No. 277 at ¶ 75–78)—is particularly important because "it is clear that plaintiffs are similarly situated when they suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to

all plaintiffs." *O'Brien*, 575 F.3d at 585.[13] Thus, any differences identified by MRD between the employment settings must overcome this strong set of commonalities between the Plaintiffs in order for this factor to weigh in favor of decertification.

MRD first contends that it exercised different degrees of supervision over different Plaintiffs. (Doc. No. 275 at 3). MRD argues that some Plaintiffs testified that MRD superintendents did not supervise them but believed, based on their observations, that MRD superintendents supervised other workers.[14] (*Id.* at 4). MRD also asserts that, according to one FCI supervisor, some but not all workers would direct questions about their assigned locations to MRD's superintendents. (*Id.*). The Court does not find this difference to be material; the fact that MRD superintendents exercised more supervision over some workers than others, or that some workers asked MRD superintendents questions while others did not, does not overcome the fact that they all were workers on the same Project performing the same types of work, and have presented evidence that they were all subject to the same practice violative of the FSLA. *See Hill v. Muscogee Cnty. Sch. Dist.*, No. 4:03-cv-60 (CDL), 2005 WL 3526669, at *2–4 (M.D. Ga. Dec. 20, 2005) (denying motion to decertify where the defendant contended that the plaintiffs had "different job duties, different hours worked, different allegations about the manner in which they were denied pay, and different supervisors," because plaintiffs presented substantial evidence that they were all subjected to the same practice of being denied overtime pay).

---

[13] It is undisputed that there was a policy—whether it was the policy of MRD or FCI—not to pay Plaintiffs one and one-half times their hourly rate for hours worked in excess of 40 hours per week. (Doc. No. 277 at ¶ 75–78). The record suggests that Defendants (or at the very least, FCI) consciously decided to not pay the overtime rate for these hours because they could not afford to do so. (*Id.*).

[14] In a footnote, MRD asserts that, despite this testimony, "there is no evidence of substantial supervision or control as to the Plaintiffs." (Doc. No. 275 at 4 n.3). But the Court is not convinced. This testimony clearly supports the notion (immaterial to the Motion to Decertify, but particularly relevant to the summary judgment motions) that MRD did in fact supervise at least some Plaintiffs.

MRD argues that another difference in factual and employment settings is that MRD "sent home" or "disciplined" some Plaintiffs, but not others (and that such occurrences were "rare"). (Doc. No. 275 at 5). MRD does *not* contend, however, that MRD *had the authority* to send home or discipline only some Plaintiffs but not others; all MRD asserts here is that only some of the workers were *in fact* sent home or disciplined. This fact thus does little to support the position that there were actual differences in the factual and employment settings between the Plaintiffs.

MRD also raises a few minor variations in several aspects of Plaintiffs' employment, including that Plaintiffs took breaks of varying lengths (30 minutes for some Plaintiffs versus one hour for other Plaintiffs), some Plaintiffs clocked out for lunch while others did not, Plaintiffs worked differing schedules, and some workers brought their own tools while others were "provided" tools by FCI (in some cases indirectly through MRD, according to MRD).[15] (Doc. No. 275 at 5, 7). These differences are insignificant and do not show that Plaintiffs are not similarly situated. As discussed above, Plaintiffs need not be *identically* situated, and one would expect these types of minor differences at any workplace among employees performing similar jobs. *See*

---

[15] MRD provides underwhelming evidentiary support regarding differences in how Plaintiffs obtained their tools. The cited deposition statements seem to suggest only that: 1) the workers brought their own basic tools, while MRD and FCI "provided" the more expensive tools, and 2) that "most [but not all]" workers brought their own tools to the worksite. (Doc. No. 275 at 5). The Court views these deposition statements as tending to show that Plaintiffs were similarly situated in that most of the workers brought their own basic tools and that FCI and MRD provided all workers with more expensive tools. The Court also notes that at least one of the deposition statements cited by MRD may contradict its contention that any tools handed to workers by MRD actually belonged to FCI. (Doc. No. 275 at 5 ("Munguia Dep. 64:5-19 ("The personnel had to buy basic tools, but the more expensive tools like the nail guns would be provided by [MRD] and some other equipment by First Class.").")). MRD does not explain what Munguia meant when he stated that the more expensive tools were "provided by [MRD]"—but one logical interpretation of "provided" would mean that these tools belonged to MRD and that MRD gave them to the workers to use. Interpreted this way, the quoted deposition testimony would contradict MRD's position that it did not own any of the tools that the workers used on the Project. Thus, the Court finds a factual dispute exists as to whether MRD supplied equipment to workers on the Project.

*Wilson v. Guardian Angel Nursing, Inc.*, No. 3:07-cv-0069, 2009 WL 790107, at *8 (M.D. Tenn. Mar. 24, 2009) (giving "little weight" under this factor to the fact that plaintiffs "worked in different regions, for slightly different pay, providing different care over different periods, and sometimes working for different employers simultaneously" because such differences are "dissociated from the merits of [the] case"); *Butler v. DirectSAT USA, LLC*, 47 F. Supp. 3d 300, 309 (D. Md. 2014) (denying motion to decertify collective action and finding this factor weighed against decertification where the plaintiffs worked varying hours and were paid different wages based on their assigned jobs, noting that "[t]he differences among [the plaintiffs] are not significant or, alternatively, go more toward damages than liability").

Further, MRD argues under this factor that Plaintiffs were treated differently under the FCI Subcontract in terms of their pay, type of employment, and type of work performed (skilled versus unskilled). MRD contends that the class members include "at least three types of FCI workers": 1) "piecework worker[s]" employed to perform drywall and finishing (for which FCI billed MRD based on "completed work" rather than by the hour); 2) skilled workers (for which FCI billed MRD based on the number of hours worked); and 3) unskilled workers (for which FCI also billed MRD on the basis of hours worked). (Doc. No. 275 at 6). MRD argues that the workers in each of these three categories are not similarly situated, because FCI billed MRD for work completed by skilled workers and unskilled workers at different hourly rates,[16] because MRD did not pay FCI an hourly rate "as to the piecework workers," and because unskilled workers "do not fit the definition of a

---

[16] MRD distinguishes between the hourly rate it paid FCI for each of these workers, and the rate that FCI ultimately paid them (noting that "FCI agreed to pay some of its unskilled laborers the same rate as the finishers, even though MRD was paying [FCI] a lower hourly rate for them"). (Doc. No. 275 at 6). Thus, MRD appears to concede that at least some of the skilled workers and some of the unskilled workers were paid the same rates. But as the Court explains below, even if the workers were paid different rates, this difference would not play a significant role in the decertification analysis.

class member in this case, [and] yet at least one Opt-In Plaintiff has testified that he was an unskilled laborer not performing drywall installation or finishing work." (*Id.* at 6–7).

This categorization of workers does not support decertification. First, it appears that MRD's argument is based primarily (if not solely) on differences in the way *FCI billed MRD* for different classes of workers, not differences in the way *workers were ultimately compensated* for their labor (whether by FCI or MRD). (*See* Doc. No. 275 at 6–7; Doc. No. 287 at ¶¶ 24–29). This argument is unavailing because, as explained above, the question before the Court on a motion to decertify a collective action is whether *the employees* are similarly situated to the named plaintiffs, not whether MRD and FCI were similarly situated with respect to one another regarding all workers.

Second, to the extent MRD bases its argument on differences in the way workers were ultimately compensated, a difference in hourly rates is not a compelling reason to decertify a collective action. *See, e.g.*, *Butler*, 47 F. Supp. 3d at 309 ("[T]he fact that Plaintiffs' damages calculations are more difficult because the technicians' hourly rates fluctuated due to the piece-rate system, is not by itself a reason to decertify a collective."); *Moss v. Crawford & Co.*, 201 F.R.D. 398, 411 (W.D. Pa. 2000) ("The differences in the plaintiffs' job duties, geographic locations and hourly billing rates do not destroy their collective claim for overtime wages under the FLSA."). This difference is more relevant to an ultimate damages calculation (should damages prove warranted) than to a decertification decision. *See Hill*, 2005 WL 3526669, at *4 (finding that differences relating to damages "should not preclude collective adjudication of the central issue—whether there was an improper practice that was formulated centrally and resulted in uncompensated overtime"); *Houston,* 591 F. Supp. 2d at 832 ("That is not to say that there can be no differences among class members or that an individualized inquiry may not be necessary in

connection with fashioning the specific relief or damages to be awarded to each class member. Rather, the inquiry is whether the presence of common issues allows the class-wide claims to be addressed without becoming bogged down by individual differences among class members."); *Butler*, 47 F. Supp. 3d at 309 (finding that where the differences between workers "go more toward damages than liability," this factor does not support decertifying the action).

Moreover, regarding MRD's argument that a particular subset of plaintiffs (the "piecework workers") were not paid an hourly rate, but instead were paid sums certain for the completion of particular work, Plaintiffs state in response:

> In this case, the record evidence is clear that all Named Plaintiffs and Opt-In Plaintiffs were paid on an hourly basis. Dkt. 273, ¶ 29. While it may have been MRD's original intention to pay FCI on a piecerate basis for the contracted work, that arrangement did not result in Plaintiffs being paid a piece rate. Defendants paid all Plaintiffs on an hourly basis during the Project. The undersigned is unaware of any Plaintiff who was paid by piece, and MRD fails to identify any such worker.

(Doc. No. 285 at 9). The Court, however, does not find that the record evidence is quite so clear that all Plaintiffs were paid exclusively on an hourly basis. Thus, the Court herein endeavors to parse out any evidence in the record bearing on the alleged fact that some subset of Plaintiffs were not actually paid on an hourly basis.

MRD cites its Statement of Undisputed Facts filed in support of its summary judgment motion to support its contention that not all workers were paid hourly, and that instead, some were "contract or piecework workers, for which MRD had agreed to pay certain sums for completed work, regardless of how many workers FCI used or how many hours it took them to complete[] the agreed upon tasks." (Doc. No. 273 at ¶ 24). In support of these contentions, the Statement of Undisputed Facts cites "Schedule B to the FCI Agreement." (Doc. No. 271-11). But the Court does not see where this document shows that some workers were paid sums certain for completed work rather than hourly rates. And in any event, MRD provides no evidence regarding whether these

workers were *in fact* paid other than hourly (as opposed to merely being expected, pursuant to the FCI Subcontract, to be paid other than hourly).

Plaintiffs respond to this contention in MRD's Statement of Facts by disputing it and stating, "Every single worker in the Plaintiff Classes was paid by the hour." (Doc. No. 287 at ¶ 24). Yet, in Plaintiffs' Statement of Facts, Plaintiffs state that "[a]bout twenty or fewer workers were sometimes paid by contract, but the vast majority of workers were paid hourly." (Doc. No. 277 at ¶ 56). This would apparently contradict Plaintiffs' position that *all* Plaintiffs were paid hourly, though Plaintiffs do clarify that these roughly twenty or fewer workers were paid by contract only "sometimes." MRD does not appear to dispute this suggested allocation of hourly versus piecework/contract workers.

Any lingering confusion is alleviated by MRD's Statement of Facts in support of its summary judgment motion, in which MRD states that "FCI testified that it chose to pay its skilled workers $20 per hour, including those who did piecework," thus suggesting that even those workers labeled "piecework workers" under the contract between MRD and FCI were ultimately paid hourly. (Doc. No. 273 at ¶ 29). MRD reinforces this idea in its Reply, where MRD states that "while FCI might have paid all its workers hourly rates, that was not how MRD compensated FCI for the work done." (Doc. No. 288 at 8). So even if the Court accepts as true that some Plaintiffs are properly classified (at least in part) as "piecework" workers, the parties seem to agree that they were all paid hourly regardless of such designation—and MRD certainly does not identify any particular Plaintiff who was not paid hourly.

The Court thus concludes that sufficient evidence supports the following findings: 1) there were roughly 20 or fewer workers who "sometimes" could be identified as "piecework" or "contract" workers under the FCI Subcontract; but 2) even if a particular worker was designated a

"piecework" worker, that does not mean the worker was not in fact paid hourly. The Court therefore finds that MRD has not made a sufficient showing that there were Plaintiffs whose pay structure was so different from that of other Plaintiffs as to support decertification.[17]

And even if the record were perfectly clear that some Plaintiffs were paid "by piece" and never paid hourly, that would not necessarily defeat certification. Piece-rate workers are entitled to one and one-half times their regular rate of pay regardless of the fact that they are paid on a piecework basis rather than via an hourly rate;[18] therefore, both piecework and hourly workers could allege (and here do allege, as all Plaintiffs in the Overtime Class allege this same violation) the same overarching FLSA violation of a failure to pay overtime wages, thus supporting collective certification. Indeed, courts in this district have denied a motion to decertify where piece-rate workers were involved, noting that individualized questions regarding the number of hours worked and how much each employee was entitled to be paid go towards damages and not to common

---

[17] Plaintiffs also contend that "all workers *listed on MRD's timesheets* were paid by the hour." (Doc. No. 277 at 37) (emphasis added). MRD states that "MRD's timesheets were meant to record only those workers that FCI was paying by the hour for purposes of preventing FCI from overbilling MRD." (*Id*. at 38). MRD's point appears to be that even if all workers listed on the timesheets were paid by the hour, that does not preclude the possibility that workers not listed on the timesheets were not paid by the hour. This point is accurate as far as it goes, but not probative. The consensus appears to remain that all but roughly 20 workers at the site were always paid hourly; furthermore, the Court cannot glean from this factual dispute whether all Plaintiffs were actually listed on MRD's timesheets (a detail without which this contention by Plaintiffs means very little for purposes of this *O'Brien* factor).

[18] "When an employee is employed on a piece-rate basis, the regular hourly rate of pay is computed by adding together total earnings for the workweek from piece rates and all other sources (such as production bonuses) and any sums paid for waiting time or other hours worked (except statutory exclusions)." 29 C.F.R. § 778.111(a). "This sum is then divided by the number of hours worked in the week for which such compensation was paid, to yield the pieceworker's 'regular rate' for that week." *Id.* "For overtime work the pieceworker is entitled to be paid, in addition to the total weekly earnings at this regular rate for all hours worked, a sum equivalent to one-half this regular rate of pay multiplied by the number of hours worked in excess of 40 in the week." *Id*.

questions of liability. For example, quoting three different Sixth Circuit opinions, this Court has observed:

> In fact, it has been stated by the Sixth Circuit (at least in the context of a Fed. R. Civ. P. 23 class action) that "[n]o matter how individualized the issue of damages may be, these issues may be reserved for individual treatment with the question of liability tried as a class action." *Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988). This is so because "it is possible that representative testimony from a subset of plaintiffs could be used to facilitate the presentation of proof of FLSA violations, when such proof would ordinarily be individualized," *O'Brien*, 575 F.3d at 585, and that "[t]he testimony of fairly representative employees may be the basis for an award of back wages to nontestifying employees," *United States Dep't of Labor v. Cole Enters., Inc.*, 62 F.3d 775, 781 (6th Cir. 1995) (citations omitted).").

*Thompson*, 967 F. Supp. 2d at 1215 (denying motion to decertify).

In *Thompson*, this Court made clear (in the context of discussing the Seventh Circuit's upholding of a decertification decision involving piece-rate workers in *Espenscheid v. DirectSat USA, LLC,* 705 F.3d 770 (7th Cir. 2013)) that although "variance in damages across class members" *may* serve as a basis for decertification in some circumstances, potential issues with resolving damages calculations via a collective action could be remedied by counsel presenting a clear trial plan (including, for example, the possibility of bifurcation and subclasses) and a "feasible method of determining damages." *Thompson*, 967 F. Supp. 2d at 1216–1217. The Court therefore rejects the notion that the possibility of some Plaintiffs being paid as "piecework" workers weighs in favor of decertification.

Finally, MRD does not defeat collective certification by pointing to a single Opt-In Plaintiff who (according to MRD) did not perform drywall installation or finishing work. Focusing on a single plaintiff does little to convince the Court that the larger group of plaintiffs is not similarly situated. Plaintiffs do not respond to MRD's contention that this individual Opt-In Plaintiff does not meet the class definition, but the Court does not find this lack of response fatal. This is because

whether a particular Opt-In Plaintiff meets the class definition is irrelevant to the Motion to Decertify. Defendant has other avenues in this litigation through which it may seek to exclude this particular individual from the class, should it choose to do so (for example, by seeking dismissal of this Opt-In Plaintiff for failure to meet the class definition).

And in any event, the deposition excerpt cited by MRD does not support its argument. MRD states that this individual "testified that he was an unskilled laborer not performing drywall installation or finishing work," citing several pages of the deposition of Luis Lizardo. (Doc. No. 275 at 6). But in the cited deposition pages, Mr. Lizardo never states that he was an *unskilled laborer*, just that his work was called "labor." And when asked *where* he performed his work at the Project, Mr. Lizardo responded, "On the floors, throw the trash away, clean the floors." (Doc. No. 274-2 at 6–7). This answer does not preclude the possibility that Mr. Lizardo was a skilled laborer or that he performed drywall work (and further, MRD did not ask *what* work Mr. Lizardo performed, but rather *where* he performed it, thus resulting in a potentially incomplete answer). Thus, MRD's contention regarding this particular individual not meeting the class definition does not tilt this factor in favor of decertification.

In sum, the Court finds that the first *O'Brien* factor weighs against decertification.

ii.    *Different defenses to which the plaintiffs may be subject on an individual basis*

MRD argues under this factor that that "each Plaintiff and Class Member might have different arguments as to whether they were personally subject to substantial control or supervision by MRD to consider MRD an employer under the FLSA." (Doc. No. 275 at 7–8). Plaintiffs respond by incorporating by reference their responses regarding the previous factor; the Court takes this to mean that Plaintiffs' position as to this factor is that because the differences between the workers described above are minor, Plaintiffs would not be subject to different defenses. The Court also

takes this to mean that Plaintiffs are making here the same argument underlying their entire Response: that MRD contends it is not the employer of *any* Plaintiff and that therefore MRD's defense will be the same as to all Plaintiffs.

MRD incorrectly frames this factor in terms of different *arguments* that could be asserted by Plaintiffs rather than the different *defenses* to which Plaintiffs may be subject. Nevertheless, just as Plaintiffs argue, MRD's argument suggests that Plaintiffs would all be subject to one single defense, *i.e.*, that MRD was not in fact any Plaintiff's employer. Thus, MRD has not pointed to different defenses to which particular (but not all) Plaintiffs may be subject; instead, MRD points to one defense to which MRD contends *all* Plaintiffs are subject. This factor thus weighs against decertification. *See Moss*, 201 F.R.D. at 411 (finding against decertification where "only two common defenses rather than a series of individual defenses will be raised against each plaintiff").[19]

### iii. *Degree of fairness and procedural impact of certifying as a collective action*

Under the final *O'Brien* factor, MRD argues: "It would be unfair and prejudicial to maintain this case as a collective action as to MRD where the record evidence shows that MRD was not a joint employer." (Doc. No. 275 at 9). Further, MRD contends that it would result in unfairness and prejudice to MRD and inefficiency concerns to the Court to continue as a collective action because Plaintiffs have failed to show that they are similarly situated. (*Id.*). Plaintiffs respond by arguing again that MRD's contention that it was not Plaintiffs' joint employer does not contribute to the "similarly situated" analysis. (Doc. No. 285 at 11). Plaintiffs argue that "it would

---

[19] Further, whether MRD actually was Plaintiffs' employer is not an issue bearing on decertification (as opposed to the merits of Plaintiffs' claims). *See, e.g.*, *Wilson*, 2009 WL 790107, at *8 (responding to the defendant's argument under this factor that some of the plaintiffs were not employed by defendant by finding that "dismissal of these [plaintiffs] is the proper course of action under the circumstances, not decertification").

be prejudicial to MRD – and Plaintiffs and this Court – to decertify this action, which will force Plaintiffs into the posture of filing 100+ individual lawsuits, now 3 years later, from which MRD will have to defend itself." (*Id*.).

This factor implicates the consideration that "[a] collective action allows . . . plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources." *Hoffmann–La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989). Additionally, "[t]he judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity." *Id*.

If MRD is correct that it was not the employer of all Plaintiffs, it would *benefit* MRD to proceed collectively, as MRD would have the chance to prevail on the merits on the claims of all Plaintiffs together (all at once) rather than defending a number of individual lawsuits. MRD has thus not raised any legitimate reasons that it would be unfair or procedurally burdensome to proceed as a collective action, and in fact, proceeding as a collective action would present fewer fairness or procedural concerns. This factor therefore does not support decertification.

   iv.   *Class-wide FLSA violation*

Going beyond these three factors *per se*, the Sixth Circuit in *O'Brien* emphasized that "it is clear that plaintiffs are similarly situated when they suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs." 575 F.3d at 585. Defendants misconstrue applicable law on this issue to suggest incorrectly that a single, FLSA-violating policy applicable to all plaintiffs is *necessary* for the plaintiffs to be considered "similarly situated." (*See* Doc. No. 275 at 10 ("[T]here was no class-wide practice or policy by MRD that violated the FLSA, and thus the Plaintiffs are not similarly

situated as to MRD.")). In fact, such a policy is *sufficient*, but *not* required, for the plaintiffs to be similarly situated.

In any event, the record is clear that Plaintiffs in each class allege that they suffered from at least one common, FLSA-violating policy in that all Plaintiffs in the "Overtime Class" allege they failed to receive overtime pay, and all Plaintiffs in the "Last Paycheck Class" allege that they failed to receive minimum wages for their last two weeks of work. (Doc. No. 285 at 6–7). Defendant's own argument actually suggests that Plaintiffs did indeed suffer from a common FLSA-violating policy—albeit suffering that, according to MRD, was not MRD's fault. (Doc. No. 275 at 11). Attempting again to cast all liability on FCI (an issue on which the Court takes no position at this time), MRD states, "FCI and the Plaintiffs have testified that FCI was the employer and was solely responsible for paying the workers, including overtime wages to workers who worked more than 40 hours a week, and that it was FCI's decision not to pay such overtime wages simply because it didn't have funds to do so." (*Id.*). Thus, MRD concedes that all Plaintiffs (at least those in the "Overtime Class") suffered from the same FLSA-violating policy of a failure to pay overtime wages (regardless of whether the failure to pay overtime wages was entirely the fault of FCI, or whether MRD also bears liability). Under *O'Brien,* this single FLSA-violating policy alone is enough to defeat decertification.

v. *Totality*

As discussed above, the determination of whether to grant a motion to decertify lies within the discretion of the Court. *Frye*, 495 F. App'x at 671. Viewing together the non-comprehensive factors from the Sixth Circuit's opinion in *O'Brien*, the Court finds in its discretion that the Motion to Decertify should be denied because Plaintiffs are similarly situated (and, in particular, because the record supports their allegation that they suffered from a common, FLSA-violating policy).

B.  MRD's Motion for Summary Judgment (Doc. No. 271)

MRD's Motion for Summary Judgment presents a single argument: that MRD is entitled to judgment as a matter of law because the record does not raise a genuine issue of material fact as to whether MRD was Plaintiffs' employer, which is to say that the record reveals that no reasonable jury could find that MRD was Plaintiffs' employer. (Doc. No. 272 at 1–2). Plaintiffs respond by arguing that "[t]he undisputed facts show the existence of an employer-employee relationship between the Plaintiffs and each Defendant." (Doc. No. 286 at 2).[20]

i.  *Definition of "employer"*

Under the FLSA, only employees are entitled to overtime and minimum wage compensation. *Davis v. Omnicare, Inc.*, No. 5:18-cv-142, 2018 WL 6932118, at *5 (E.D. Ky. Dec. 12, 2018). And "employees have standing to sue only their current or former employers under the FLSA." *Ivery v. RMH Franchise Corp.*, 280 F. Supp. 3d 1121, 1127 (N.D. Ill. 2017); *see also Berger v. Nat'l Collegiate Athletic Ass'n*, 843 F.3d 285, 289 (7th Cir. 2016) ("Under the FLSA, alleged employees' injuries are only traceable to, and redressable by, those who employed them.") (internal quotation marks omitted). Summary judgment is thus appropriate if the defendant shows that the plaintiff cannot produce evidence sufficient for a reasonable jury to find that the defendant was the plaintiff's employer.

---

[20] The Court notes that to defeat MRD's Motion for Summary Judgment, presuming that MRD has met its initial burden, Plaintiffs need only demonstrate a genuine issue of material fact. Plaintiffs respond to the motion not by setting forth specific facts showing that there is a genuine issue for trial, but instead by arguing that all material facts are undisputed and that therefore Plaintiffs are entitled to judgment as a matter of law. In doing so, Plaintiffs invite upon themselves a more difficult burden than what is necessary under the law. Nonetheless, the Court will analyze and dispose of the motion under the requisite law.

The FLSA unhelpfully[21] defines an "employer" as any person acting directly or indirectly in the interest of an employer in relation to an employee, 29 U.S.C. § 203(d), and "employee" as "any individual employed by an employer," *id.* § 203(e)(1). "Employ" is defined as "to suffer or permit to work." *Id.* § 203(g). Whether a defendant constitutes a plaintiff's employer under the particular circumstances at issue is a legal determination. *See Larson v. Leading Edge Outsourcing, Inc.*, No. 3:08–00446, 2010 WL 1229348, at *7–8 (M.D. Tenn. Mar. 29, 2010) (*citing Donovan v. Brandel*, 736 F.2d 114, 1116 (6th Cir. 1984)).

MRD argues that facts that are undisputed based on the evidence of record show that MRD was *not* Plaintiffs' "statutory or joint" employer. But Plaintiffs argue that the undisputed facts demonstrate that MRD *was* Plaintiffs' employer. Underlying the parties' diametrically opposed arguments is their disagreement regarding the appropriate "test" for determining whether an entity is an "employer" under the FLSA. Considering the unhelpfulness of the FLSA's definition highlighted above,[22] the Court is unsurprised by this confusion. It thus herein endeavors to clarify what is required to make a party an "employer" under the FLSA.

Adding to the confusion is the parties' misuse (or perhaps, misunderstanding) of the role of "joint employer" status. The FLSA contemplates there being several simultaneous employers who *each* may be responsible for compliance with the FLSA (i.e., "joint employers"). *Rhea v. W.*

---

[21] "The relevant statutory definitions are notable for their circularity and breadth, if not their clarity." *Davis*, 2018 WL 6932118, at *5.

[22] The Court previously commented on the fact that "[t]hese definitions are patently circular—tautological—thus begging the question of what they really mean. There is much the Court can say and has said before on this topic, but it need not do so at this juncture." *Martinez v. First Class Interiors of Naples, LLC*, No. 3:18-cv-00583, 2020 WL 3316115, at *5 n.8 (M.D. Tenn. June 18, 2020) (Richardson, J.).

*Tenn. Violent Crime & Drug Task Force*, No. 2:17-cv-02267, 2018 WL 7272062, at *3 (W.D. Tenn. Dec. 12, 2018). As a district court in the Sixth Circuit recently explained:

> "More than one 'employer' can be simultaneously responsible for FLSA obligations." *Fegley v. Higgins*, 19 F.3d 1126, 1131 (6th Cir. 1994) (citing *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 965 (6th Cir. 1991)). The FLSA does not define "joint employer," nor has the Sixth Circuit "explicitly identified a test for evaluating joint employment relationships in the context of FLSA claims." *Reyes-Trujillo v. Four Star Greenhouse, Inc.*, 513 F. Supp. 3d 761, 779 (E.D. Mich. 2021). "District courts in this Circuit are divided with respect to the proper test (or tests) to apply to determine if a defendant is a joint employer." *Id.* at 779–80 (citations omitted) (discussing a number of potential frameworks for analyzing joint employment). But, according to another federal district court, if an entity meets the definition of "employer" vis-a-vis an employee and another entity also meets the definition vis-a-vis the same employee, then the two are "joint employers" of that employee. *See New York v. Scalia*, 490 F. Supp. 3d 748, 776 (S.D.N.Y. 2020).

*Farris v. All. Health Care Braeview, Inc.*, No. 1:19-cv-2599, 2022 WL 504215, at *8 (N.D. Ohio Feb. 18, 2022) (brackets omitted). And as for *Scalia*, it offers a helpful discussion of what it means to be a joint employer, and of the significance (or lack thereof) of the "joint employer" designation:

> Imagine an employee works for a staffing agency. The staffing agency is the employee's employer. Then imagine that a corporation hires the staffing agency to provide temporary employees. The staffing agency hires out the employee to the corporation. Assume that the corporation also meets the FLSA's definition of employer. Both the staffing agency and the corporation become joint employers. The staffing agency was the employee's "employer." Now it is her "joint employer." Why? Because the corporation has also become the employee's employer. Now assume that the corporation hires the employee full time. The staffing agency stops qualifying as the employee's employer. The corporation was the employee's "joint employer." Now it is just her "employer." Why? Only because the staffing agency is no longer her employer.

*Scalia*, 490 F. Supp. 3d at 776–77. The upshot of the view set forth in *Scalia* (and apparently embraced in *Farris*, 2022 WL 504215, at *8 n.4) is both reasonably clear and, in the view of the undersigned, correct: in assessing whether a particular defendant is an "employer" of the

plaintiff(s) under the FLSA, (1) the proper question is never whether that defendant and another party are "joint employers" of the plaintiff(s); (2) instead, the proper question is whether the defendant at issue is *an* "employer" of the plaintiff(s); (3) if so, and if *another* party is also an "employer" of the plaintiff(s), then each of them is an "employer" of the plaintiff(s) in its own right and thus bears whatever liabilities and responsibilities an "employer" bears under the FLSA; and (4) if anyone wants to refer to them together as "joint employers," fair enough, but really all that matters is that each of them is independently an "employer."

So it is not necessary for the Court to break this inquiry into two separate parts, one dealing with "joint employer" status and one dealing with "statutory employer" status, as MRD did in the Motion (and Plaintiffs did in their response). Instead, the Court need only determine whether a genuine issue of material fact exists as to whether MRD was Plaintiffs' employer (irrespective of whether Plaintiffs also had another "joint employer"). If so, then there is a genuine issue as to whether MRD is liable under the FLSA, even if there is another employer (such as FCI) who also could be liable.[23]

---

[23] Perhaps this would mean that MRD would properly be considered jointly (or perhaps jointly and severally) liable with the other employer. The Court previously opined in this case:

> If the Court finds that Mr. Drywall is a joint employer, Mr. Drywall will be individually and jointly responsible for complying with the provisions of the FLSA governing record retention. *See* 29 C.F.R. § 791.2(a) ("[A]ll joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the act ....")[.]

*Martinez v. First Class Interiors of Naples, LLC*, No. 3:18-cv-00583, 2020 WL 1694571, at *7 (M.D. Tenn. Apr. 7, 2020). Since that opinion was issued, however, the regulation relied upon (29 C.F.R. § 791.2) has been rescinded and thus no longer supports what the Court said previously about joint liability. *See* Rescission of Joint Employer Status Under the Fair Labor Standards Act Rule, 86 Fed. Reg. 40,939-01 (July 30, 2021). In any event, the Court need not determine at this juncture whether any liability MRD may ultimately bear in this case would be joint, or joint and several, with any other employer.

"The remedial purposes of the FLSA require the courts to define 'employer' more broadly than the term would be interpreted in traditional common law applications." *Dole*, 942 F.2d at 965 (quoting *McLaughlin v. Seafood, Inc.*, 942 F.2d 875, 877 (5th Cir. 1989) (per curiam)). "[O]ur circuit precedent maintains that 'in deciding whether a party is an employer, 'economic reality' controls[24] rather than common law concepts of agency.'" *Rhea v. W. Tenn. Violent Crime & Drug Task Force*, 825 F. App'x 272, 275–76 (6th Cir. 2020) (brackets omitted) (quoting *Dole*, 942 F.2d at 965). Sixth Circuit cases indicate that the economic reality test "considers the alleged employer's power to hire and fire the person, supervision and control of schedules and conditions of employment, determination of the rate and method of payment and the maintenance of employment records." *Larson,* 2010 WL 1229348, at *8 (citing *Cole Enters., 62* F.3d at 778); *Rhea*, 825 F. App'x at 276.[25] Additional relevant factors include "whether the plaintiff is an

---

[24] MRD asserts that the economic reality test should not be applied because "the Department of Labor recently promulgated regulations that disapprove of using the economic reality test in determining joint employer status." (Doc. No. 272 at 4) (citing 29 C.F.R. § 791.2(c)). But MRD's reliance on these regulations is off-base, for two reasons. First, as just noted, these regulations have been rescinded (albeit, in fairness to MRD, not until a few months after MRD's Motion for Summary Judgment was filed). Second, as explained by the Court above, the Court need not separately analyze (or determine) whether MRD is a joint employer. Instead, as further discussed above, the Court need only reach the question of whether MRD was *an* employer of Plaintiffs (regardless of whether Plaintiffs had an additional employer, so as to make MRD what could be referred to as a "joint employer"). Because, as the Court explains below, a genuine issue of material fact exists as to whether MRD was an employer of Plaintiffs, the Court's analysis will stop there.

[25] When arguing that Plaintiffs were employed by MRD, Plaintiffs cite *Acosta v. Off Duty Police Servs., Inc.* 915 F.3d 1050 (6th Cir. 2019) for the articulation of the economic reality test. According to *Acosta*, "[t]his 'economic reality' test considers six factors: 1) the permanency of the relationship between the parties; 2) the degree of skill required for the rendering of the services; 3) the worker's investment in equipment or materials for the task; 4) the worker's opportunity for profit or loss, depending upon his skill; 5) the degree of the alleged employer's right to control the manner in which the work is performed; and 6) whether the service rendered is an integral part of the alleged employer's business." *Id.* at 1055 (internal citations and quotation marks omitted). But *Acosta*'s test is concerned primarily with whether a particular worker is properly characterized as an employee *as opposed to* an independent contractor—a question that the Court finds is not the

integral part of the operations of the putative employer," "the extent of the plaintiff's economic dependence on the defendant," and "the defendant's substantial control of the terms and conditions of the work of the plaintiff." *Ellington v. City of E. Cleveland*, 689 F.3d 549, 556 (6th Cir. 2012).[26]

This standard "is not a precise test susceptible to formulaic application." *Id.* at 555. Rather, the employment relationship "is to be determined on a case-by-case basis upon the circumstances of the whole business activity." *Donovan*, 736 F.2d at 1116 (citing *Rutherford Food Corp. v.*

_____

central issue here. In *Acosta*, it was undisputed that the plaintiffs were *either* employees *or* independent contractors; the question was which of these two things the plaintiffs were, and the Sixth Circuit was seeking to explain how to distinguish one from the other. In the present case, by contrast, MRD's primary position is not that Plaintiffs were independent contractors rather than employees of MRD, but rather that they were positioned via-à-vis MRD in such a way that they were actually neither. That is, MRD argues that Plaintiffs certainly were not employees of MRD, does not concede that Plaintiffs instead were independent contractors of MRD, and argues that Plaintiffs were "at most" or "at best" (but by no means necessarily) independent contractors of MRD. (Doc. No. 272 at 2, 14, 17). MRD's ambivalent position as to whether Plaintiffs were even MRD's independent contractors is perhaps best summarized by its statement that "[t]o the extent that Plaintiffs argue that they did perform work for MRD's benefit, it was not as a statutory employer but rather pursuant to the FCI Subcontract and thus, at best, Plaintiffs would be considered MRD's independent contractors." (*Id.* at 14).

Because MRD argues (albeit only in the alternative, unlike the defendant in *Acosta*) that Plaintiffs were only independent contractors, Plaintiffs' reliance on *Acosta* is not entirely misplaced. That is because Plaintiffs' arguments under the *Acosta* factors *could have* been useful were the Court to have addressed MRD's alternative argument that Plaintiffs were at most independent contractors of MRD. But the Court does not do so, because it finds that MRD has not shown that Plaintiffs lack evidence to reach the jury on the issue of whether MRD was Plaintiffs' employer; in other words, a jury could find that Plaintiffs were employees of MRD, which necessarily means that a jury could reject the notion that Plaintiffs were merely independent contractors of MRD, thus eliminating any need to separately analyze MRD's alternative argument concerning independent-contractor status. Plaintiffs' response to the Motion is not particularly helpful in that it does not track the same factors from *Rhea* and *Ellington* that the Court will use to guide its analysis. The Court will nonetheless glean what it can from Plaintiffs' brief when analyzing each factor.

[26] MRD cites *Ellington* when discussing whether MRD was Plaintiff's statutory employer, arguing that the economic reality test is applicable. (Doc. No. 272 at 15) ("The economic realities of the instant case lead only to the conclusion that MRD was not the Plaintiffs' employer[.]"). It thus appears that Defendant does *not* contest that the economic reality test is the applicable test when considering whether an entity is a statutory employer under the FLSA—Defendant's objection to the use of the economic reality test appears to be constrained to its use in the context of joint employer status (a topic which the Court will not reach in this opinion, as previously discussed).

*McComb*, 331 U.S. 722 (1947)). "Consistent with the case-by-case approach prescribed by *Donovan*, these factors are not exhaustive and no one factor is dispositive; rather, it is incumbent upon the courts to transcend traditional concepts of the employer-employee relationship and assess the economic realities presented by the facts of each case." *Ellington*, 689 F.3d at 555 (internal citations, quotation marks, and brackets omitted).

The Court will thus resolve the Motion by determining whether a genuine issue of material fact exists as to whether MRD was Plaintiffs' employer under the non-exhaustive factors set forth by the Sixth Circuit in *Rhea* and the additional factors mentioned by the Sixth Circuit in *Ellington*. Because so doing is especially efficient in this case, the Court will assume *arguendo* that MRD has shifted the burden to Plaintiffs to present evidence demonstrating a genuine issue of material fact, and then consider together all evidence presented by either side. Notably, in the Court's view, the optimal analytical procedure here is to determine, factor by factor, whether each successive factor suggests the absence of a genuine issue of material fact as to whether MRD was Plaintiffs' employer.

    ii.   *Analysis*

        a.   <u>The defendant's power to hire and fire employees</u>

The parties agree that MRD did not recruit or hire Plaintiffs. (Doc. No. 286 at 6, Doc. No. 272 at 5). MRD did hire the labor broker (FCI's owner, Reyes) who was responsible for hiring and recruiting workers for the Project. (Doc. No. 286 at 6). The parties dispute whether FCI could hire workers on the Project without approval from MRD. (Doc. No. 277 at ¶ 38). Plaintiffs cite two deposition statements that suggest FCI would (at least sometimes, if not always) consult with MRD before "bring[ing] anybody in." (*Id.*). But MRD states that "FCI could and did hire workers on the Project without approval from MRD." (*Id.*). MRD also admits that it "could recommend or request

that certain workers not be assigned by FCI to the Project," which, in essence, means that MRD had some say in which workers were hired. (Doc. No. 287 at 19). Thus, the Court finds that the record shows MRD alone did not have the power to hire Plaintiffs, although it did play a role in the hiring process.

The parties dispute whether MRD had the power to fire Plaintiffs (and whether MRD, in fact, did fire workers on the Project). (Doc. No. 277 at ¶ 36). The Court finds that a genuine issue of fact exists as to whether MRD had the power to fire employees. Plaintiffs cite multiple examples of MRD firing workers, supported by citations to various deposition statements indicating that MRD in fact sent workers home (*i.e.*, "fired") workers on multiple occasions. (*Id.*). MRD disputes this fact and states that "MRD could recommend or request that certain workers be sent home if they had violated safety rules, and could recommend or request that certain workers not be assigned by FCI to the Project, but MRD did not have the power to fire any of FCI's workers, and FCI could have assigned those workers to other projects." (*Id.*). MRD cites "Exh. 16, Philibert Decl. ¶¶ 12, 13; Exh. 3, Perez Depo. 109:7-10; Exh. 4, Brito Depo. 97:4-8; Exh. 11, Castro (Carlos) Depo. 111:23-112:2; [and] Exh. 13, Lemaire Depo. 70:25-71:10" as evidence in support of this contention; upon the Court's review of these exhibits, however, none provide sufficient factual support for the contention that MRD did not have the power to fire workers on the Project.[27] Plaintiffs, on the other hand, cite specific examples, supported by record evidence, that MRD did in fact fire or send home workers on multiple occasions. Therefore, the record shows that MRD exercised at least some control over whether Plaintiffs were employed as workers for the Project

---

[27] The majority of the cited depositions state only that the deponents did not know whether MRD fired any workers from the project. The deposition of Carlos Castro could be viewed to provide limited support for MRD's position, but only insofar as Castro testified that he did not "know of" or "notice" MRD firing workers on the project, (Doc. No. 277-11 at 24), which is not to say that MRD did not have the power to fire workers or that MRD did not ever in fact fire workers.

because they could, at the very least, recommend that workers be fired from that particular worksite, despite FCI's being responsible for actually carrying out the firing. Further, the difference between "firing" a worker and "send[ing] them home" does not appear to the Court to be material. (*Id.*). Thus, the Court finds a genuine issue of fact as to whether MRD had the power to fire Plaintiffs.

      b. <u>The defendant's supervision and control of employee work schedules or conditions of employment</u>

It appears undisputed that FCI communicated to Plaintiffs the days and times they needed to report to work, when they could take breaks, and how long their breaks could be. (Doc. No. 287 at 25). However, the record also shows that MRD had the power to alter Plaintiffs' schedules by sending them home from the worksite. (*Id.* at 19). Plaintiffs also cite multiple deposition statements which indicate that when the workers were actually on the jobsite, it was MRD, not FCI, who dictated when workers took lunch breaks. (*Id.* at 26). It is also undisputed that Plaintiffs "would take directions from FCI as to assignments" and that FCI supervisors instructed and supervised Plaintiffs. (*Id.* at 33–35). However, MRD also had representatives on site every day monitoring the workers and making sure they were completing their assigned tasks.[28] (Doc. No. 277 at ¶ 28).

MRD argues that "FCI solely supervised and controlled the Plaintiffs' . . . conditions of employment" yet admits that MRD reprimanded workers for not following safety regulations, provided workers with tools, and supervised Plaintiffs' work to ensure compliance with the FCI Subcontract. (Doc. No. 272 at 6). MRD admits that "MRD Superintendents were on site and gave

---

[28] MRD responds to Plaintiffs' contention that "MRD Project Manager, Richard Nadeau, and MRD Superintendents 'walked the jobsite on a daily basis, all day to make sure all workers were doing what they were assigned,'" by stating that this fact is disputed. (Doc. No. 277 at ¶ 28). But the text following MRD's dispute of this statement does not actually indicate that MRD disputes that MRD project managers and superintendents walked the Project to ensure worker compliance.

instructions to Plaintiffs." (*Id.*). A genuine issue of fact thus exists as to the amount of supervision and control MRD exercised over Plaintiffs' work schedules and conditions of employment.

### c.  The defendant's determination of rate and method of payment

The parties dispute, to some extent, the role played by MRD in setting the rate workers were paid. The parties agree that FCI was the entity that directly provided Plaintiffs with their paychecks and set the standard rates for each type of worker on the Project. (Doc. No. 287 at 21). But MRD does appear to have played *some* role in determining Plaintiffs' pay rate and calculating their hours worked.

Plaintiffs cite several deposition statements indicating that MRD kept the daily time sheets for Plaintiffs and "raised and lowered workers' hourly rates [as] it saw fit." (Doc. No. 287 at ¶ 27; Doc. No. 286-1 at 11–16). MRD also classified each worker with a "code" that corresponded with their rate of pay. (Doc. No. 286 at 13). The manner in which a worker was "coded" thus determined the worker's pay rate. Based on some of the deposition testimony cited, it appears that the coding of a worker involved some exercise of discretion and could have a significant impact on what a worker was paid (*See, e.g.*, Doc. No. 277-9 at 45). So in summary, because MRD did the coding, and because coding was discretionary at least to an extent, MRD had some amount of control (and discretion) over how much each worker was paid.

Overall, the Court perceives the record to show a genuine dispute of fact on this factor, concluding that a jury could reasonably find that MRD played a role in the determination of Plaintiffs' pay rate such that this factor would weigh in favor of MRD being Plaintiffs' employer.

### d.  The defendant's maintenance of employment records

It is undisputed that MRD tracked Plaintiffs' hours working on the Project. MRD's only argument under this factor is that this tracking was done only in order to comply with MRD's

contractual agreement with FCI, which under 29 C.F.R. § 791.2(a)(2) would make the fact of MRD's tracking inapplicable to the (joint) employer inquiry. But as discussed above, this regulation has been rescinded.[29] The record is thus clear that MRD maintained employment records in the form of keeping timesheets for workers on the Project. Accordingly, this factor does not support MRD's contention that it has shown the absence of a genuine issue as to whether MRD was Plaintiffs' employer.

        e.   <u>Whether the plaintiff is an integral part of the operations of the putative employer</u>

Regarding this factor, MRD states only that "[f]or purposes of this Motion, MRD will not dispute that drywall work is an integral service it provides to general contractors. However, MRD notes that, as is customary and as MRD did here, it generally subcontracts with other companies who supply the labor force for its drywall services." (Doc. No. 272 at 15 n.1). Plaintiffs make no additional arguments under this factor after referencing MRD's admission that drywall work is an integral service for MRD. The Court agrees and finds that the record supports a finding that Plaintiffs' work on the Project was an integral part of MRD's operations. Accordingly, this factor

---

[29] Even if the regulation had not been rescinded, MRD's argument here would fail. The regulation states that the potential employer's maintenance of such records (even if performed in relation to contractual compliance) is still relevant if they pertain to "the hiring or firing, supervision and control of the work schedules or conditions of employment, or determining the rate and method of payment of the employee." 29 C.F.R. § 791.2(a)(2). Here, Plaintiffs assert, with supporting deposition testimony, that MRD's timesheets "took precedence" or "controlled" if there were discrepancies between MRD's records and FCI's records. (Doc. No 277 at ¶ 51). MRD disputes this fact and asserts, with supporting deposition testimony, that the only reason MRD compared its timesheets to FCI's timesheets was to prevent FCI from overbilling MRD (and that any disputes between the two "did not affect what FCI paid its employees for their work"). (*Id.*). Thus, a genuine dispute of fact exists as to whether MRD's records were merely kept to monitor compliance with the subcontract, or if they played some role in "the hiring or firing, supervision and control of the work schedules or conditions of employment, or determining the rate and method of payment of [Plaintiffs]." 29 C.F.R. § 791.2(a)(2).

does not support MRD's contention that it has shown the absence of a genuine issue as to whether MRD was Plaintiffs' employer.

### f. Extent of the plaintiff's economic dependence on the defendant

The analysis under this factor overlaps with much of what the Court has already discussed. Defendant argues that Plaintiffs were not economically dependent on MRD because (according to MRD) it was not MRD, but rather FCI "who determined Plaintiffs' rate of pay and who was solely responsible for paying their compensation." (Doc. No. 272 at 15). MRD asserts, "FCI has admitted that regardless of whether or what amounts MRD paid FCI under the terms of the FCI Subcontract, FCI was responsible for paying the Plaintiffs the monies it owed them for the work [they] performed" and that "FCI admitted that it was its decision whether to pay the Plaintiffs overtime, and that FCI made its decisions not based on anything that MRD told them, but solely on whether it could afford to pay them based on the monies FCI had." (*Id*. at 15–16).

Plaintiffs argue that they were economically dependent on MRD because "MRD suffered Plaintiffs to work and received the benefit of Plaintiffs' labor." (Doc. No. 286 at 5). To provide support for this position, beyond the support provided by Plaintiffs' arguments made in connection with the factors discussed above, Plaintiffs allege (with supporting evidence) that Plaintiffs worked full time on the Project for nearly a year (thus demonstrating a certain permanency of the relationship between Plaintiffs and MRD), that Plaintiffs were dependent on the expertise of MRD superintendents to perform their work, and that there was no opportunity for Plaintiffs' profit or loss depending on their skill, speed, or overall performance.[30] (*Id*. at 8–11).

---

[30] This final argument relates to the "profit or loss" factor analyzed by courts when determining employee status. Where a plaintiff lacks the opportunity for profit or loss based on that plaintiff's job performance, this factor "weighs heavily" in favor of employee status (rather than independent contractor status). *LeMaster v. Alternative Healthcare Sols., Inc.*, 726 F. Supp. 2d 854, 862 (M.D. Tenn. 2010) ("When analyzing the profit or loss factor, the key question is whether the Plaintiffs'

The parties dispute both the extent of MRD's investment in equipment and materials, and the relevance of any such investment to the assessment of this factor. MRD argues that it is undisputed that "FCI made all the investments in the equipment and materials used by the Plaintiffs, as was required by the FCI Subcontract" and that although MRD may have occasionally purchased a tool, "the monies spen[t] on such purchases [were] later deducted from the payments that MRD made to FCI." (Doc. No. 272 at 16–17). Plaintiffs dispute these alleged facts. (Doc. No. 287 at ¶¶ 75–77). Both parties cite deposition testimony in support of their position regarding who provided Plaintiffs with tools, and who ultimately paid for such tools. (*Id.* at 29–30).

Regardless of who "provided" (that is, supplied to Plaintiffs and/or ultimately paid for) tools on the Project, Plaintiffs correctly point out that the proper focus under this factor is the *workers'* investment in equipment in relation to the putative employer's investment in equipment, rather than (as MRD argues) the amount *MRD* invested in tools compared to what *FCI* invested in tools. *Cf. Acosta*, 915 F.3d at 1056 (stating that analysis of "investment in specialized equipment," a factor under the *Acosta* test, "requires comparison of the worker's total investment to the company's total investment") (internal citation omitted). Thus, the relative investment in tools and equipment as between MRD and FCI does not support MRD's contention that it has shown the absence of a genuine issue as to Plaintiffs' lack of economic dependence on MRD.

> g.  The defendant's substantial control of the terms and conditions of the work of the plaintiff

The above discussion concerning other factors demonstrates that MRD has failed to show a lack of a genuine issue as to whether it had "substantial control" over the terms and conditions

---

earnings were tied to their performance once they accepted work. It is the mark of an independent contractor that a stake in the venture provides both carrot and stick, such that planning, efficiency and skill are rewarded above and beyond the initial contract.") (internal citations and quotation marks omitted).

of Plaintiffs' work. As discussed above, though MRD may dispute some of these alleged facts, the record provides support for the fact that MRD supervisors were on site at the Project (nearly) every day, gave instructions to Plaintiffs, had the power to discipline and/or fire Plaintiffs for failure to comply with certain policies, played a role in setting Plaintiffs' breaks, and maintained employment records for Plaintiffs by keeping timesheets. This factor thus does not support the position that there is an absence of a genuine issue as to whether MRD was Plaintiffs' employer.

### h. Totality

In sum, of the seven factors considered, the Court finds a genuine dispute of fact with respect to five of them, and finds that the other two factors—namely, the defendant's maintenance of employment records and whether the plaintiff is an integral part of the putative employer's operations—favor the existence of an employer-employee relationship. Under these circumstances, the cumulative effect of these factual disputes is material—*i.e.*, their cumulative resolution would affect the outcome of the suit under the governing substantive law.[31] In other words, evidence concerning the economic realities of MRD's relationship with Plaintiffs is sufficient for a reasonable jury to find an employment relationship, and so the Court finds that the record raises a genuine issue of material fact as to whether MRD was Plaintiffs' employer. Therefore, MRD's Motion for Summary Judgment will be denied.

---

[31] The Court notes that, in theory, it is possible for genuine disputes of fact as to one or more factors of a multi-factor test *not* to be material if, based on the undisputed factors, a reasonable jury could reach only one conclusion. For example, if six factors favored the summary-judgment movant, and one factor raised a genuine dispute of fact, summary judgment would still be appropriate if a reasonable jury could not find for the non-movant at trial even assuming it were to view the disputed factor in the non-movant's favor. (In such circumstances, the genuinely disputed factor would not be *material*.) That is not the situation presented here, however, where only two out of seven factors are undisputed and both of those favor the non-movant.

C. <u>Plaintiffs' Motion for Summary Judgment (Doc. No. 210)</u>

Plaintiffs seek summary judgment as to 1) Plaintiffs' class claims (Count I); 2) Named Plaintiff Castro's individual retaliation claim[32] (Count II); and 3) the amount of average weekly damages. (Doc. No. 210). While both FCI and MRD are subjects of this Motion, only MRD has responded.

      i.    *Class claims (Count I)*

Plaintiffs seek summary judgment as to their claims asserted under the FLSA that Defendants failed to pay Plaintiffs the required minimum wage for each hour of work they performed. (Doc. No. 1 at 13). In an action to recover unpaid overtime compensation under the FLSA, the burden rests first on the plaintiff to prove by a preponderance of the evidence that "(1) there exists an employer-employee relationship; (2) there was an engagement in activities within coverage of the FLSA; and (3) the defendant failed to pay the plaintiff the overtime pay required by law." *Kowalski v. Kowalski Heat Treating, Co.*, 920 F. Supp. 799, 806 (N.D. Ohio 1996); *Alvarado v. Skelton*, No. 3:16-cv-3030, 2017 WL 2880396, at *2 (M.D. Tenn. July 6, 2017). "Once the plaintiff has made a prima facie case, the burden shifts to the employer to show by a preponderance of the evidence that one of the exemptions afforded by Section 213 of the FLSA applies to the employment in question. 29 U.S.C. § 201 et seq." *Kowalski*, 920 F. Supp. at 806. Plaintiffs argue in particular that they are entitled to judgment as a matter of law because the record does not raise a genuine issue of material fact that 1) Plaintiffs are employees (and not independent

---

[32] The FLSA retaliation claim was originally asserted by both Individual Plaintiff Castro and Individual Plaintiff Martinez. The Court previously declined to certify the claim as a collective action. (Doc. No. 97 at 18–20). After Plaintiffs moved for summary judgment, Martinez was dismissed from the lawsuit on March 25, 2021. (Doc. Nos. 269, 270.) Accordingly, the Court now considers Plaintiffs' arguments regarding the retaliation claim only with respect to the remaining Plaintiff, Castro.

contractors) of Defendants; 2) Defendants are Plaintiffs' and Class Members' statutory employers; and 3) Defendants failed to compensate class members for work performed.

The Court has already discussed in depth its reasoning as to why a genuine issue of material fact exists regarding the employer-employee relationship between Plaintiffs and MRD. The Court incorporates by reference that discussion here. Consistent with its approach on MRD's Motion for Summary Judgment, the Court will assume *arguendo* that Plaintiffs have shifted the burden to MRD to present evidence demonstrating a genuine issue of material fact, then look at all evidence presented by either side to determine whether Plaintiffs have shown the absence of a genuine issue of material fact as to whether MRD is Plaintiffs' employer. The Court is aware that although *MRD* has not shown the absence of a genuine issue of material fact as to this issue (such that the issue would have to be decided as a matter of law in MRD's favor), that does not necessarily mean that *Plaintiffs* have not shown the absence of a genuine issue of material fact on this issue (such that the issue must be decided as a matter of law in Plaintiffs' favor). But as it turns out, Plaintiffs have not made the requisite showing either. As the Court's prior discussion indicates (and as the Court specifically intended to indicate), the Court concludes that actually there is evidence in favor of *each side* to enable it to reach a jury on the issue of whether MRD was Plaintiffs' employer. Summary judgment will therefore be denied to Plaintiffs on their class claims against MRD.

As to FCI, however, the Court has not thus far discussed the employer-employee relationship (or any other element of Plaintiffs' *prima facie* case for their class claims against FCI). The Court again notes that FCI has not responded to Plaintiffs' Motion. If no response is timely filed, a motion shall be deemed to be unopposed. Local Rule 7.01 (a)(3). In addition, if a timely response to a moving party's statement of material facts is not filed, the asserted facts shall be deemed undisputed for purposes of summary judgment. Local Rule 56.01(f).

The Court may not grant Plaintiffs' Motion as to FCI solely because FCI failed to respond. *Mullenix v. Eastman Chemical Co.*, 237 F. Supp. 3d 695, 710 (E.D. Tenn. 2017). The Court, at a minimum, must examine Plaintiffs' Motion to ensure that Plaintiffs have discharged their initial burden. *Chrzan v. Mackay*, Case No. 1:19-cv-116, 2020 WL 7774741, at *2 (W.D. Mich. Nov. 30, 2020) (quoting *Miller v. Shore Fin. Servs., Inc.*, 141 F. App'x 417, 419 (6th Cir. 2005)).

After reviewing Plaintiffs' Motion, accompanying memorandum, Statement of Undisputed Facts, and other applicable filings, the Court finds that the facts (which are deemed undisputed as to FCI for purposes of Plaintiffs' Motion) demonstrate that summary judgment should be granted as to FCI on Plaintiffs' class claims. Plaintiffs have carried their initial burden of showing that (1) Plaintiffs were employed by FCI, (2) the activities at issue were within the coverage of the FLSA, and (3) FCI failed to pay overtime compensation to Plaintiffs as required by law. FCI has not shown otherwise or contested these findings. Had FCI responded to Plaintiffs' motion and presented countervailing evidence, as MRD did, FCI conceivably could have established a genuine dispute as to the existence of one or more of these elements. But FCI did not do so. Therefore, Plaintiffs' Motion will be granted as to FCI for the claims brought against it on a class-wide basis under the FLSA.

## ii. *Individual retaliation claims (Count II)*

Individual Plaintiff Castro next argues that he is entitled to judgment as a matter of law on his FLSA retaliation claim. (Doc. No. 212 at 23). MRD rightfully responds that this claim was brought against FCI and Reyes only. (Doc. No. 276 at 15; Doc. No. 1 at ¶ 86). Again, FCI has not responded to Plaintiffs' summary judgment motion as to Castro's retaliation claim. Castro argues that he is entitled to judgment as a matter of law on the retaliation claim because it is undisputed that: 1) Castro engaged in protected activity by demanding his wages on May 29, 2018; 2)

Defendants refused to give him his pay check that day; and 3) Defendants have refused to pay Castro his earned wages to date "because of [his] exercise of [his] statutory rights." (Doc. No. 212 at 23).

The Court examines Castro's Motion to ensure that he has discharged his initial burden. Castro seeks to establish his retaliation claim only via an indirect-evidence case under the familiar *McDonnell Douglas* framework (and not a direct-evidence case);[33] thus, Castro, as the summary judgment movant, must establish an indirect-evidence *prima facie* case of retaliation in order to shift the burden to the defendant (regardless of what subsequent steps of the *McDonnell Douglass* framework would ultimately reveal). "To make [a] prima facie case of retaliation, the plaintiff must prove that (1) she engaged in protected activity under the FLSA; (2) her exercise of this right was known by the employer; (3) the employer took an employment action adverse to her; and (4) there was a causal connection between the protected activity and the adverse employment action." *Pettit v. Steppingstone, Ctr. for the Potentially Gifted*, 429 F. App'x 524, 530 (6th Cir. 2011).

---

[33] The Sixth Circuit has summarized the applicability and workings of the *McDonnell Douglas* burden-shifting framework as follows:

> A plaintiff may show discrimination by direct evidence, or a plaintiff lacking direct evidence of discrimination may succeed on a Title VII claim by presenting indirect evidence under the framework first set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802–03, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973).

> To succeed under the *McDonnell Douglas* framework, the plaintiff must first make out a *prima facie* case of discrimination by a preponderance of the evidence. . . . Once the plaintiff makes out a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for" the adverse employment action. Should the defendant do so, the plaintiff then must prove by a preponderance of the evidence that the stated reasons were a pretext for discrimination.

*Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606–07 (6th Cir. 2019) (citations omitted).

Even absent a response from FCI, the Court finds that a genuine dispute of material fact exists as to Castro's retaliation claim. In particular, the Court finds that, based on the record evidence, a reasonable juror could find that there was not a causal connection between the alleged protected activity and what either the Complaint asserts to be, or the Motion and accompanying memorandum assert to be, the relevant adverse employment action.

Both in the Complaint and in the Motion and supporting memorandum, Castro asserts that the protected activity occurred when he "arrived at the Project site on May 29, 2018 to demand [his] wages." (Doc. No. 1 at ¶ 89; Doc. No. 212 at 23). In the Complaint, Castro asserts the adverse employment action occurred when he was terminated. (Doc. No. 1 at ¶ 90) ("Defendants' termination of Plaintiffs and collective group members is a clear, actionable adverse action."). The Court will assume *arguendo* that these activities constitute protected activity and an adverse employment action, respectively, under the FLSA. But the Court cannot find that Castro has met even his initial burden to show the absence of a genuine dispute as to a causal connection between the two; as the Court has previously stated, the record suggests that "the decision to terminate members of the Last Paycheck Class was made *prior to*, and thus not in retaliation for, their demanding their paychecks." (Doc. No. 97 at 20) (emphasis added). Castro provides no additional evidence in support of this Motion to suggest otherwise. Thus, the Court cannot find that Castro's demanding his paycheck *caused* his termination.

The Motion and supporting memorandum assert an entirely *different* adverse employment action than the Complaint—namely, that the adverse employment action occurred when Defendants refused to give Castro his pay check on May 29, 2018. (Doc. No. 212 at 23). Plaintiffs assert that Defendants refused to pay Castro his earned wages to date "because of [his] exercise of [his] statutory rights." (*Id.*). Castro may not assert a new theory on an element of his *prima facie*

case through briefing on a summary judgment motion. *See, e.g.*, *Luke v. Fam. Care & Urgent Med. Clinics*, 323 F. App'x 496, 499 (9th Cir. 2009) (finding it was proper to exclude expert declarations submitted in summary judgment response because "they presented a new theory as to a key element of Plaintiffs' medical negligence claim"); *MSPA Claims 1, LLC v. Covington Specialty Ins. Co.*, 548 F. Supp. 3d 1269, 1277–78 (S.D. Fla. 2021) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a). . . . The new claim need not involve [the] assertion of an entirely independent legal right but new facts that would provide a theory of recovery under a previously asserted legal right.") (internal citations omitted). Thus, the Court could decline to consider Defendants' refusal to give Castro his paycheck as an alleged adverse employment action, as this theory was newly presented through summary judgment briefing.

But out of an abundance of caution, and in the alternative, the Court will explain why— even considering this new theory and assuming *arguendo* that Defendants' not giving Castro his paycheck on or after May 29, 2018 constitutes an adverse employment action under the FLSA— Castro still has not met his initial burden to show the absence of a genuine dispute as to a causal connection between the protected activity and the withholding of wages. The evidence of record suggests a reasonable likelihood that Defendants would have refused to give Castro his paycheck regardless of whether he demanded the payment owed on May 29, 2018. That is to say, it is likely FCI simply was not going to provide the paycheck and that Castro merely confirmed (rather than caused) that fact when he demanded his paycheck to no avail.

Therefore, regardless of whether the adverse employment action at issue is Castro's termination or the denial of his wages, or both, summary judgment will not be granted on the retaliation claim.

iii.    *Damages*

Finally, Plaintiffs argue that summary judgment should be granted as to the issue of damages. Plaintiffs state that the "estimated average" approach to calculating class damages should apply, and that it is undisputed that Plaintiffs worked an average of 58 hours per week. (Doc. No. 212 at 24–25). Plaintiffs also argue that "it is undisputed that Defendants failed to pay Plaintiffs and Class Members for their last two weeks of work on the Project" and that therefore, "as a matter of law, Plaintiffs and Last Paycheck Class Members are each entitled to $841 in damages for Defendants' violation of their Section 6 rights." (*Id*. at 25). Finally, Plaintiffs assert they are entitled to liquidated damages and punitive damages. (*Id*. at 25–26).

MRD responds that individual questions remain as to the relevant damages calculations (for example, the length of each Plaintiff's lunch and other breaks, which Plaintiffs left work early, and calculations as to some Plaintiffs who did not work for the entirety of the Project). (Doc. No. 276 at 14–15). MRD also argues that at least one Opt-In Plaintiff does not fit the Class definition. (*Id*.). Again, FCI failed to respond.

The Court declines to find a lack of a genuine issue of material fact on the issue of damages because Defendants' liability is still not decided. As discussed above, a genuine dispute of material fact exists as to MRD's liability for the class claims and as to FCI's liability for the individual retaliation claims. It would thus be premature for the Court to determine whether there is no genuine issue of material fact on the question of damages when liability has yet to be determined (except insofar as FCI's liability on Count I). *See Hurley v. Kent of Naples, Inc.*, Nos. 2:10-cv-334/2:10-cv-752, 2011 WL 13137381, at *2 (M.D. Fla. June 30, 2011) ("The Court finds that the issue of whether plaintiff is entitled to liquidated damages rests upon a finding of

liability. Since summary judgment as to liability was denied as to both parties, summary judgment is inappropriate on the issue of liquidated damages.").

The Court finds it appropriate here to reserve for trial the issue of damages.[34] Thus, the Court will deny Plaintiffs' motion as it relates to the calculation of damages.

## <u>CONCLUSION</u>

For the reasons discussed herein:

The Court will deny MRD's Motion to Decertify (Doc. No. 274).

The Court will deny MRD's Motion for Summary Judgment (Doc. No. 271).

The Court will grant in part and deny in part Plaintiffs' Motion for Summary Judgment (Doc. No. 210). The Court will grant summary judgment to Plaintiffs on Count I as to FCI. The Court will deny summary judgment to Plaintiffs on Count I as to MRD, on Count II as to FCI, and as to all Defendants on the issue of damages.

An appropriate order will be entered.

*Eli Richardson*

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[34] That is not to say that the Court would be prohibited from considering, in its discretion, at the summary judgment stage whether it could decide as a matter of law what the damages *would be* if, hypothetically, liability *were* established at trial. But it is to say that the Court has no doubt that it has, and here should exercise, the discretion to decline to undertake such consideration even though liability of one defendant on one count has been established.